[No. G020262. Fourth Dist., Div. Three. Jan. 29, 1999.]

R. MICHAEL HALL et al., Plaintiffs and Respondents, v.
JAMES G. HARKER, Defendant and Appellant.

COUNSEL

O'Brien Watters & Davis, Michael G. Watters and Janis H. Grattan for Defendant and Appellant.

Chevalier, Allen & Lichman and Roger P. Freeman for Plaintiffs and Respondents.

OPINION

**WALLIN, Acting P. J.**—This action for malicious prosecution against James G. Harker, an attorney, presents the question whether alleged bias on the part of the trial judge towards attorneys in general and the defendant in particular requires reversal. We conclude it does.

### Procedural History

Dudley Taylor, a real estate broker, lived in Paso Robles in 1985. In February 1986, he went to work for Troy Investment Fund (Troy) as marketing director for Troy's real estate development projects in Southern California. Taylor signed a series of one-page contracts for base salary plus commission per unit sold, but he claimed Troy's chief executive officer, R. Michael Hall, also orally promised him a bonus commission of 2 percent of all gross sales under his brokerage license.

A dispute arose over the bonus commission, and in February 1991, Taylor sought legal advice from James Harker. Harker helped Taylor draft a letter charging Hall with preventing the sellout of the Troy properties to prolong his salary and benefits, thereby breaching his fiduciary duty to the Troy investors. Taylor sent the letter to the District Attorneys of Orange and San Luis Obispo Counties. Harker wrote another letter detailing Hall's misdeeds

to the law firm representing Hall and Troy and sent copies to various regulatory agencies.

In October 1991, Hall and Troy sued Taylor for defamation. Taylor, represented by Harker, filed a cross-complaint which was ultimately amended to allege violations of Labor Code section 970 (misrepresentations inducing relocation for employment), fraud, breach of contract, and breach of the covenant of good faith and fair dealing based on Hall's refusal to pay Taylor the bonus commission.

Hall and Troy obtained summary judgment on the cross-complaint in December 1992. The trial court found "that Taylor could not reasonably rely on oral promises for the payment of brokerage commissions, that Taylor executed fully integrated written contracts for the payment of brokerage commissions pursuant to the Statute of Frauds, the Parol Evidence Rule bars consideration of oral statements contrary to those written documents, and there were no other contracts, oral or implied, between Taylor and Cross-defendants as a matter of law." The court also found, based on a Department of Real Estate document, that Taylor had opened an office in Los Angeles County some months before he relocated to Orange County, allegedly in reliance on Hall's unenforceable oral promise of a 2 percent bonus commission.

The trial on Hall and Troy's complaint proceeded. At the trial judge's suggestion that Taylor might be exposing himself to charges of extortion in sending the first letter, Taylor asserted his privilege against self-incrimination and refused to testify as an adverse witness. Hall and Troy proved up their damages and were awarded $754,971. Taylor filed a notice of appeal but dismissed the appeal before the record was filed.

In September 1994, Hall and Troy filed this action against Harker for malicious prosecution in filing and maintaining the cross-complaint. During trial preparation, a copy of a letter from the Department of Real Estate was found in the files of counsel for Hall and Troy. The letter corrected the information regarding Taylor's office address to show he did not open a Los Angeles County office before he began employment with Troy in February 1986. The letter was dated November 1992, before the motion for summary judgment was heard in the underlying case, and Harker claimed the law firm acted unconscionably in failing to correct the assertion in the motion for summary judgment.

After a court trial, the court ruled for Hall and Troy, finding the underlying cross-complaint was terminated in their favor and that Harker had

initiated and maintained the cross-complaint without probable cause and with malice. With respect to the nondisclosure of the Department of Real Estate correction letter, the court found "[t]here was nothing to indicate anything other than a problem inherent with handling masses of paper in a medium size office with much work, many clients, and a centralized mail room staffed by human beings with normal human limitations." It also found a copy of the letter had been sent to Taylor and was subsequently given to Harker, and neither of them advised the trial court of its existence during the summary judgment hearings.

### Judicial Bias

Throughout the trial, the court expressed negative opinions about attorneys. Harker claims this obvious bias requires reversal because it created the appearance of impropriety and denied him a fair and impartial trial in violation of his right to due process. After a comprehensive review of the record, we agree.

"Whatever disagreement there may be in our jurisprudence as to the scope of the phrase 'due process of law,' there is no dispute that it minimally contemplates the opportunity to be fully and fairly heard before an impartial decisionmaker." (*Catchpole* v. *Brannon* (1995) 36 Cal.App.4th 237, 245 [42 Cal.Rptr.2d 440].) A judge's impartiality is evaluated by an objective, rather than subjective, standard. That is, " ' "due to the sensitivity of the question and inherent difficulties of proof as well as the importance of public confidence in the judicial system, the issue is not limited to the existence of an actual bias." ' " (*Id.* at p. 246.) The question becomes whether " ' "a reasonable man [or woman] would entertain doubts concerning the judge's impartiality." ' " (*Ibid.;* see also *In re Marriage of Iverson* (1992) 11 Cal.App.4th 1495 [15 Cal.Rptr.2d 70]; Cal. Code Jud. Conduct, canon 2 [23 West's Cal. Codes Ann. Rules, pt. 2 (1996 ed.) p. 709]; Code Civ. Proc., § 170.1, subd. (c).) When the allegations of bias relate to factual issues, they are particularly troubling because the appellate court usually defers to the trial court's factual and credibility findings. (*Catchpole* v. *Brannon, supra,* 36 Cal.App.4th at p. 247.) Implicit in this time-honored standard of review is the assumption that such findings were made fairly and impartially.

The comments made by the trial judge here reflected his opinion that attorneys occupy a position of power over the ordinary citizen which they routinely abuse. For example: "[T]hat's what I like when an attorney is on the stand being grilled and know[s] what it's like to be sued and be grilled." "I'd love to see attorneys put on the stand. I think it is poetic justice. And I really hope that somebody that is just a tiger at examination or

cross-examination gets them and just works them over. Generally speaking they come out of the experience, if it's been properly done, humbled. And much more appreciative of what they've put other people through." "[O]ne of the things I think is an appropriate learning tool for attorneys is for them to be on the witness stand for some time and to be grilled unmercifully so they can learn how it feels and possibly be a bit more sympathetic on whom they inflict their terror . . . ."

The court indicated its belief that attorneys are predisposed to use the judicial process as a means of coercion. "There's a great deal of commentary both in the legal profession and in the nonlegal profession [about] the cudgel that attorneys use against citizens, beating them down, killing the forest by the papers they produce in the course of the trial. Ten billion dollars in the State of California is used by attorneys in their suits, and it produces nothing except money for attorneys." The next day, he repeated, "[A]ttorneys have an unusual cudgel they can use against citizens by virtue of their ability to control the evidence. [¶] You know you have the weapons. The citizen does not—weapons, not evidence—and he needs or she needs to be able to feel secure from its arbitrary, inappropriate use. And I think that's what malicious prosecution is all about."

The court apparently believes attorneys spend unnecessary time on cases to inflate their fees. "I am always distressed when there is a great deal of legal threshing around, which simply runs up the legal costs, and it bothers me because, normally speaking, your law is fairly clear, just that the attorneys ignore it and try to do something which the law does not allow." "Attorneys' questions are kind of like expenditures in a family. They always rise to take up the available time or available cash." The court characterized Harker's deposition of Hall as "simply a deposition asking every conceivable question that the attorney can think of because he is paid by the hour."

The court insinuated that attorneys use tricks to distort the truth: "I am not the kind of weak willed individual that can be seduced by a silver tongued lawyer." "Pulling things out of hats is what attorneys do for a living." And at times the court resorted to outright ridicule of the profession: "[A]ttorneys are somewhat like firedogs. You know, the fire bell rings and they jump around and bark, and sometimes even in excitement urinate all over and behave in an inappropriate fashion, but that's only because of the excitement of the moment, not because of any necessary intent on their part."

Contrary to respondents' assertions, these and other similar statements by the trial judge cannot be characterized as "jovial behavior" or "verbal repartee." These statements strongly suggest the judge held preconceived

ideas about the proclivity of attorneys to initiate and churn litigation for financial gain, regardless of the merit of the claims or the damage it might do to the defendant. Whether Harker initiated Taylor's cross-complaint without probable cause and for an improper purpose was the central issue in the malicious prosecution case against him. Harker, of course, maintained he believed his client's version of the facts and presented evidence to support the reasonableness of that belief. The trial judge, however, made credibility findings that rejected Harker's story and that of his supporting witnesses. It is difficult to imagine a more direct connection between the judge's expressed bias and the gravamen of the case before him.

Hall and Troy correctly point out that *Catchpole* and *Iverson*, cases in which judicial bias resulted in reversal, dealt with gender bias. They claim attorneys are not entitled to the same protection from discrimination that women have been accorded. But *Catchpole* and *Iverson* and the cases on which they rely clearly focus on the appearance of unfairness when a judge reveals preconceived ideas based on stereotypes. "We are mindful of the demands on overburdened trial judges and the frustration they sometimes feel when impeded in the discharge of their heavy responsibilities. Understandable expressions of such frustration rarely warrant appellate attention. We must also keep in mind, however, that the source of judicial authority lies ultimately in the faith of the people that a fair hearing may be had. Judicial behavior inimical to that necessary perception can never be countenanced and may well provide a basis for reversal even if not the product of gender bias. In this case, the trial judge's reference to plaintiffs [*sic*] cause as 'nonsense,' combined with his other comments from the bench, show prejudgment that is unacceptable quite apart from consideration of gender." (*Catchpole* v. *Brannon*, *supra*, 36 Cal.App.4th at p. 253.)

Having found the appearance of judicial bias, we would reverse the judgment and remand the matter to a different judge for a new trial on all issues (*Catchpole* v. *Brannon*, *supra*, 36 Cal.App.4th at p. 247), but for another error that requires reversal and terminates the case: The underlying case did not result in a termination on the merits favorable to Hall and Troy.

### No Favorable Termination on the Merits

Malicious prosecution requires the plaintiff to establish that the prior action was commenced by or at the direction of the defendant and was pursued to a legal termination in the plaintiff's favor; was brought without probable cause; and was initiated with malice. (*Robbins* v. *Blecher* (1997) 52 Cal.App.4th 886, 892-893 [60 Cal.Rptr.2d 815].) Harker argues the summary judgment in favor of Hall and Troy on the cross-complaint was not

a favorable termination on the merits because it was based on the statute of frauds and the parol evidence rule. We agree.

Whether the termination of a prior case is favorable to the defendant so as to support an action for malicious prosecution is not determined merely because the defendant has prevailed. " ' "The test is whether or not the termination tends to indicate the innocence of the defendant or simply involves technical, procedural or other reasons that are not inconsistent with the defendant's guilt." [Citations.]' " (*Robbins* v. *Blecher, supra,* 52 Cal.App.4th at p. 893.) When an action is terminated because it is barred by the statute of limitations, for example, the resolution is not considered favorable to the defendant. "Termination of an action by a statute of limitations defense must be deemed a technical or procedural[,] as distinguished from a substantive[,] termination. Like other procedural defenses— i.e., lack of personal jurisdiction or failure to comply with the statute of frauds—the limitations defense is waived unless timely raised." (*Lackner* v. *LaCroix* (1979) 25 Cal.3d 747, 751 [159 Cal.Rptr. 693, 602 P.2d 393]; see also *Warren* v. *Wasserman, Comden & Casselman* (1990) 220 Cal.App.3d 1297, 1301-1302 [271 Cal.Rptr. 579].)

■ The statute of frauds is clearly a procedural defense. It renders certain types of contracts unenforceable, not invalid, unless they are reduced to writing and signed by the party to be charged. (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 261, p. 258.)

■ The parol evidence rule, however, is problematic because it is not merely a rule of evidence exclusion based on policy or probative value, but is a substantive rule of law. (2 Witkin, Cal. Evidence (3d ed. 1986) Documentary Evidence, § 963, p. 911.) "The rule derives from the concept of an integrated contract. When the parties to an agreement incorporate the complete and final terms of the agreement in a writing, such an integration in fact becomes the complete and final contract between the parties. Such a contract may not be contradicted by evidence of purportedly collateral agreements." (*Hayter Trucking, Inc.* v. *Shell Western E&P, Inc.* (1993) 18 Cal.App.4th 1, 14 [22 Cal.Rptr.2d 229]; see also *Alling* v. *Universal Manufacturing Corp.* (1992) 5 Cal.App.4th 1412, 1433-1434 [7 Cal.Rptr.2d 718].) The purpose of the parol evidence rule "is to make sure that the parties' final understanding, deliberately expressed in writing, shall not be changed." (2 Witkin, Cal. Evidence, *supra*, Documentary Evidence, § 964, p. 912.) "According to this substantive rule of law, when the parties intend a written agreement to be the final and complete expression of their understanding, that writing becomes the final contract between the parties, which may not be contradicted by even the most persuasive evidence of collateral agreements. Such evidence is legally irrelevant. [Citations.]" (*EPA Real Estate Partnership* v. *Kang* (1992) 12 Cal.App.4th 171, 175 [15 Cal.Rptr.2d 209].)

But even if the parol evidence rule renders evidence of collateral agreements legally irrelevant, it cannot erase the *existence* of the agreements, if they actually took place. And if they took place as alleged, their irrelevancy precludes a legal determination of the defendant's culpability. Accordingly, we hold a resolution of the underlying case based on the parol evidence rule cannot be a favorable termination to the defendant so as to support a subsequent action for malicious prosecution.

A narrow construction of the element of favorable termination is sound policy. "[A]ctions for malicious prosecution have historically been viewed with disfavor due to the potential chilling effect on persons considering reporting a crime or pursuing legal remedies in court. [Citation.]" (*Ludwig* v. *Superior Court* (1995) 37 Cal.App.4th 8, 29 [43 Cal.Rptr.2d 350].) Furthermore, we are loathe to " '[expand] the opportunities for initiating one or more additional rounds of malicious prosecution litigation after the first action has been concluded.' " (*Warren* v. *Wasserman, Comden & Casselman, supra*, 220 Cal.App.3d at p. 1304.)

The judgment is reversed. Appellant is entitled to costs of appeal.

Crosby, J., and Sonenshine, J., concurred.