[No. G029961. Fourth Dist., Div. Three. June 3, 2003.]

MIGUEL HERNANDEZ, Plaintiff and Appellant, v.
RICHARD M. PAICIUS, Defendant and Respondent.

454

**COUNSEL**

Law Offices of Federico Castelan Sayre, Federico C. Sayre and Kent M. Henderson for Plaintiff and Appellant.

Tuverson & Hillyard, Kari M. Myron and Constance A. Endelicato for Defendant and Respondent.

**OPINION**

**IKOLA, J.**—Miguel Hernandez (plaintiff) appeals from a judgment after jury trial of his medical malpractice action against Richard M. Paicius, M.D.

(defendant). Plaintiff contends the court erred in denying motions in limine relating to evidence of his alienage and psychological condition. He further asserts the court improperly denied his motion to disqualify defense counsel and declare a mistrial based on counsel's misconduct. As we discuss, *post*, the court's denial of the motion regarding alienage and the motion for mistrial compel reversal.

First, we note the remarks of the trial court give the appearance the court held preconceived ideas based on stereotypes of undocumented aliens. The comments raise doubts about the fairness and impartiality of the proceeding and cast the judicial system itself in a bad light in the eyes of the litigants and the public at large.

One hundred years ago, our Supreme Court cautioned against judges making oral pronouncements wholly out of accord with recognized principles of fairness. It stated: "The trial of a case should not only be fair in fact, but it should also appear to be fair. And where the contrary appears, it shocks the judicial instinct to allow the judgment to stand." (*Pratt v. Pratt* (1903) 141 Cal. 247, 252 [74 P. 742].) Such a case is presented here. We therefore reverse and remand for a new trial, with directions to the presiding judge of the superior court to assign the matter to a different judge. (Code Civ. Proc., § 187; see also *In re Marriage of Iverson* (1992) 11 Cal.App.4th 1495, 1502 [15 Cal.Rptr.2d 70].)

The court's denial of plaintiff's motion for mistrial constitutes an additional ground for reversal. The motion was based on the misconduct of defendant's counsel in cross-examining Fred E. Aengst, M.D., plaintiff's expert witness who had been his treating physician in his workers' compensation case. Aengst was defense counsel's *own client* in certain medical malpractice cases against him, and defense counsel continued to represent Aengst in an ongoing disciplinary proceeding regarding the physician's license to practice medicine. As we will discuss more fully, *post*, the court should have avoided the unseemly inquisition to which Aengst was subjected by declaring a mistrial.

FACTS

While working at a food packaging plant, plaintiff suffered broken bones and other injuries when his right hand was caught on a dough hook in the bread-making machine he was operating. Following two surgeries, he had various treatments for persistent severe pain in the right wrist and forearm. When the pain began to radiate into the area of his upper arm and shoulder, causing him sleep disturbance, his physicians referred him to defendant, an

anesthesiologist practicing in the area of pain management. Defendant performed, inter alia, a stellate ganglion block injection procedure, in which pain medication is injected in the throat area near the larynx. After the injection, plaintiff's voice became hoarse, a persistent condition leading to the underlying malpractice suit. Plaintiff alleged he had sustained laryngeal nerve damage causing vocal cord dysfunction or paralysis and abiding hoarseness. He claimed defendant failed to obtain his informed consent and fell below the standard of care in performing the surgery.[1] Following trial, by special verdict the jury found defendant had not been negligent in plaintiff's care and treatment. Other facts will be discussed as pertinent to the legal issues.

## DISCUSSION

Plaintiff challenges discretionary rulings on three motions in limine. His burden is to demonstrate the court's "discretion was so abused that it resulted in a manifest miscarriage of justice. [Citations.]" *(Wm. R. Clarke Corp. v. Safeco Ins. Co. of America* (2000) 78 Cal.App.4th 355, 359 [92 Cal.Rptr.2d 709].) We conclude plaintiff has carried this burden.

### Motion in Limine re Residency Status

Pursuant to Evidence Code sections 350 and 352, plaintiff moved the court in limine "for an order instructing Defendant and his counsel not to refer to, interrogate concerning, comment on, or attempt to suggest to the jury in any way, and further, to advise their witnesses not to refer to, comment on, or attempt to suggest any information regarding Plaintiff's residency status, ethnicity or country of origin." Plaintiff asserted such matters were irrelevant because he was not claiming loss of earnings or earning capacity. He further argued the evidence would be highly prejudicial, without any counterbalancing probative value.

The following summarizes at length the proceedings relating to the motion. In light of his waiver of loss of earnings damages, plaintiff relied on *Rodriguez v. Kline* (1986) 186 Cal.App.3d 1145 [232 Cal.Rptr. 157], arguing that evidence of immigration status should be excluded as irrelevant to the issue of liability. Defendant's counsel urged the court to allow the evidence, contending plaintiff's own vocational counselor would testify "[s]he could not understand how [plaintiff] received workers' compensation benefits legally because one is not to receive such benefits when one is an illegal

---

[1] The lawsuit was brought on behalf of Hernandez and Sylvia Luna, the latter seeking damages for loss of consortium. Luna's claim was dismissed before trial. Birch Outpatient Medical Center, named as an additional defendant, was dismissed in the pleading stage.

alien," and "she could not give [plaintiff] any counseling because he's an illegal alien and should not be working in the United States." Counsel argued the issue went to plaintiff's "credibility and impeachment," adding, "[T]here may be information out there that is going to come out that this man falsified documents or did whatever to get this job and then to go on and get workers' compensation benefits." Counsel continued: "[I]t may have something to do with any falsification of records, social security, whatever it is he did, but I would like to get to the bottom of it, and I think the jury should hear it. [¶] We have a man claiming numerous injuries, . . . and he tries to side step [his illegal status] [by] withdrawing the [earnings] claims. [¶] . . . I want to show that he was not being truthful. So . . . absolutely that residency status has been put into issue and it is relevant."

Responding to counsel's argument, the court stated, "There's a lot of jurors unfortunately, Mr. Henderson [plaintiff's counsel], as you may find out sadly at the end of this trial, [who] feel that anyone that comes into this fine country illegally, even for the motive of working, to come in illegally and then try to take advantage of our system for legal setup for legal resident, that we all pay money to support, pay their salaries, pay the buildings, yada, yada. [¶] If those people come in illegally, get caught up in the system, and then go through the system as if they are legal by phoneying up an I.D. or social security number, lying and getting treatment here, getting education here, whatever it is, here illegally, it's like forfeited *ab initio*. It's just without any claims, without any pity. [¶] It's too bad this poor gentleman hurt his foot, hand, whatever, but he came here to work illegally. So he's running the risk of getting injuries. He's running a risk of getting injured on any job if he is injured and outside the system. Tough. That's your problem."

Plaintiff's counsel noted the court "basically made my argument for me. [T]here [are] jurors who in fact are so prejudiced against someone who is in that situation that based upon who they are[,] that they're from Mexico, they did not enter the country legally, [the jury] may decide in fact . ... no medical malpractice [was] committed and no injury was caused to him. But that's not based upon the evidence. . . . It's based instead on something that is more prejudicial than probative of any issue. It's based upon whether he in fact came from somewhere else. It's in the nature of character evidence excluded under Evidence Code section 787."

The court responded, "I understand your argument, but you missed my point. I'm alerting you to the realities of life. It's not the reality [of] life as you conveniently make the jump where someone is from and their ethnicity to a malpractice doctor and getting injured. You missed something there.

You jumped right over the illegality portion, the lying portion, the credibility portion. [¶] So if this jury is going to hear a story about a guy who's been damaged, can't work, and they're going to have to believe him about—and I noticed he dropped some of the claims so he might have been fudging on those—faking it as it were, that if he's here claiming this hoarseness has impacted his life so much he's entitled [to] a ton of money from this good doctor they have to believe him. If they don't believe him he gets nada."

The court went on: "Credibility goes to lying, forging, things like that. Not just crossing the border illegally. You can cross the border and sleep, cross the border and hug a tree illegally. That's fine. But when you cross the border and hug the tree and then get injured or have a baby and want to go through our system and have U.S. taxpayers pay for it, and then it's done poorly, then you sue them and document some paperwork so you can maintain an action to get money, I think a juror has to know all the facts to find out is this person credible[?] Did they suffer this injury[?] Will they suffer this longer[?] Can he get work[?] Can't he[?] Can he talk, can't he[?] Goes to credibility[,] not where you're born."

Plaintiff's counsel persisted, arguing: "If he crossed the border illegally in this country, and if he used a false social security number, both of those actions . . . wouldn't even arise to having been arrested for those things, let alone a conviction of a felony within the last 10 years. [¶] It's a prior unconvicted bad act that is in the nature of character evidence, to say that someone on some occasion used a false social security number, that then they will act in conformity with that character, later to lie to the doctor[.] I don't know what he could have told the doctor that would be false because it's a very simple procedure, but somehow lied to the doctor and that be some kind—part of the claim, and it's just not—it's character evidence. It's not a [conviction] of a felony. It's not admissible. It's not probative of anything that he—he is not prohibit[ed] from making a claim for medical malpractice because he happens to either have used the false social security number or entered this country without documentation. That doesn't prohibit him from making a claim against the doctor. [¶] And for the jury to consider that as part of whether he is entitled to recovery or not is simply—doesn't have any probative value. Has very high prejudicial effect because as the court pointed out, there's many people who don't think kindly of that type of behavior."

The court found the evidence was "[j]ust like [in] a burglary conviction in a criminal trial. Prejudicial as hell but they get admitted all the time." When plaintiff's counsel protested there had been no conviction of any crime, defense counsel, following the court's lead, gave counsel a word of pragmatic advice, stating, "That's what jury selection process is. There's jurors

that hate doctors. I have to weed through it, and you have to select [the jury based on] biases that they may have against your client."

Plaintiff's counsel asserted once more that Evidence Code sections 787 and 1101 prohibited evidence of a character trait based on prior bad acts, and reminded the court plaintiff was not making a claim for loss of future earnings. To no avail, he closed his argument stating, "And where he's not making a claim for loss of future earnings, his residency status, one way or the other, whether documented [or] undocumented, is flat out inadmissible especially to try to prove liability." The court did not change its position regarding the admissibility of the evidence; it denied the motion in limine.

Given the green flag to pursue the issue, defendant's counsel, in opening statement, told the jury a vocational rehabilitation specialist, who was never called to testify, "concluded [that plaintiff's] alleged voice injury certainly has not caused him any loss of earnings because he shouldn't be working here legally because he doesn't have his proper documentation. So there goes that claim."

We examine this record in light of the law. Before turning to the central issue of the appearance of fairness and impartiality in the proceedings, however, we observe the Legislature apparently felt strongly enough about the sensitive subject of immigration status to put essentially identical language in three separate statutes enacted shortly after this case was tried. Labor Code section 1171.5, enacted in 2002, provides: "The Legislature finds and declares the following: [¶] (a) All protections, rights, and remedies available under state law, except any reinstatement remedy prohibited by federal law, are available to all individuals regardless of immigration status who have applied for employment, or who are or who have been employed, in this state. [¶] (b) For purposes of enforcing state labor and employment laws, a person's immigration status is irrelevant to the issue of liability, and in proceedings or discovery undertaken to enforce those state laws no inquiry shall be permitted into a person's immigration status except where the person seeking to make this inquiry has shown by clear and convincing evidence that [this/the] inquiry is necessary in order to comply with federal immigration law. [¶] (c) *The provisions of this section are declaratory of existing law.* [¶] (d) The provisions of this section are severable. If any provision of this section or its application is held invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application." (Italics added.) Civil Code section 3339 and Government Code section 7285, enacted at the same time, contain identical language with the exception that in subdivision (b), they both apply the protections for the additional purpose of enforcing "civil rights, and

employee housing" laws. These statutes leave no room for doubt about this state's public policy with regard to the irrelevance of immigration status in enforcement of state labor, employment, civil rights, and employee housing laws. Thus, if an employer hires an undocumented worker, the employer will also bear the burden of complying with this state's wage, hour and workers' compensation laws.

We now analyze the issue at hand, following precedent established under like circumstances. First, the court absolutely should have granted plaintiff's motion to exclude reference to his residency status. Only relevant evidence is admissible. (Evid. Code, § 350.) The court lacks discretion to admit irrelevant evidence. (*People v. Scheid* (1997) 16 Cal.4th 1, 14 [65 Cal.Rptr.2d 348, 939 P.2d 748]; *People v. Babbitt* (1988) 45 Cal.3d 660, 681 [248 Cal.Rptr. 69, 755 P.2d 253] [there is no discretion vested in a court to admit irrelevant evidence].)[2] The evidence was irrelevant to the issue of liability under *Rodriguez v. Kline, supra,* 186 Cal.App.3d at page 1149, a decision plaintiff cited to the court below. Plaintiff was not claiming loss of future earnings. Thus, his potential for making money did not matter. In fact, plaintiff was not claiming the loss of *any* earnings, past or future.[3] Not only was the evidence entirely irrelevant; it was, as the court illustrated only too clearly in its comments, highly inflammatory. As the *Rodriguez* court observed, "[E]vidence relating to citizenship and liability to deportation almost surely would be prejudicial to the party whose status was in question." (*Rodriguez*, at p. 1148.)

Likewise, defendant's contention that immigration status and other suggested "bad acts" are somehow admissible to attack plaintiff's credibility must be rejected. Evidence Code section 787 provides, in relevant part, "[E]vidence of specific instances of his [or her] conduct relevant only as tending to prove a trait of his [or her] character is inadmissible to attack or support the credibility of a witness." Under that statute, the "bad acts" which defense counsel hoped to uncover in a fishing expedition in the jury's presence,[4] were plainly inadmissible on the issue of credibility. Despite plaintiff's repeated reference to Evidence Code section 787, the court based its ruling on the mistaken assumption that evidence of "bad acts" would be admissible. Even though the statute is no longer applicable in criminal cases

---

[2]Evidence Code section 210 defines relevant evidence as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."

[3]Although the argument on the motion was based solely on plaintiff's withdrawal of any claim for lost earnings, we note the record is also devoid of evidence or discussion of future economic loss of any type.

[4]As noted, *ante*, defense counsel never made an offer of proof, but simply suggested there "may be information out there," and she would "like to get to the bottom of it."

(see *People v. Harris* (1989) 47 Cal.3d 1047, 1081 [255 Cal.Rptr. 352, 767 P.2d 619]), it is alive and well in the civil context.

Ordinarily, having determined the court abused its discretion in denying the motion in limine, we would assess whether the error was harmless. Indeed, defendant argues there was no harm because no *evidence* of alienage was actually introduced. But the motion in limine sought to exclude any reference to immigration status, and defense counsel made sure, at the outset of trial, to portray plaintiff as an illegal alien. Given the hot button pushed by counsel in opening statement, we will not presume the jury disregarded defense counsel's inflammatory remark.[5]

Where, as here, the appearance of judicial bias and unfairness colors the entire record, we depart from the general rule requiring plaintiff to make an affirmative showing of prejudice. The test is not whether plaintiff has proved harm, but whether the court's comments would cause a reasonable person to doubt the impartiality of the judge or would cause us to lack confidence in the fairness of the proceedings such as would necessitate reversal. The record here inspires no confidence in either case.

We are not without guidance in this conclusion. In *Hall v. Harker* (1999) 69 Cal.App.4th 836 [82 Cal.Rptr.2d 44], another panel of this court reversed a judgment, finding the court's expressions of negative opinions about attorneys throughout the trial denied the attorney defendant a fair and impartial trial in violation of his right to due process. (*Id.* at p. 841.) The court observed the statements "strongly suggest the judge held preconceived ideas about the proclivity of attorneys to initiate and churn litigation for financial gain, regardless of the merit of the claims or the damage it might do to the defendant. Whether Harker initiated Taylor's cross-complaint without probable cause and for an improper purpose was the central issue in the malicious prosecution case against him." (*Id.* at pp. 842-843.)

Another panel of this court also decided a case dealing with the appearance of gender bias, *In re Marriage of Iverson, supra*, 11 Cal.App.4th 1495. We do not reiterate the trial court's remarks, comprehensively categorized

---

[5]As should be apparent from our discussion, *ante*, we also reject defendant's argument that evidence of alienage was admissible for purposes of impeachment. We are never told, nor was the trial court told, the substance of plaintiff's testimony that would be impeached by his immigration status. The only case cited by defendant in support of this proposition is *People v. Viniegra* (1982) 130 Cal.App.3d 577 [181 Cal.Rptr. 848], in which the criminal defendant was tried and convicted on charges of fraud in obtaining public aid in violation of the Welfare and Institutions Code, perjury in violation of the Penal Code, and fraudulent acquisition of federal food stamps, also in violation of the Penal Code. The case is so obviously inapt it warrants no discussion.

and discussed in the *Iverson* decision. (*Id.* at pp. 1499-1502.) Suffice to say the reviewing court found "[t]he oral statement of decision of the judge who presided over the trial of the validity of the premarital agreement—and who acted as trier of fact in that proceeding—is so replete with gender bias that we are forced to conclude Cheryl could not have received a fair trial." (*Id.* at p. 1497.) The judgment was reversed and the case remanded with directions it be retried before a different judge. (*Ibid.*)

Finally, in *Catchpole v. Brannon* (1995) 36 Cal.App.4th 237 [42 Cal.Rptr.2d 440], another case involving the appearance of gender bias, the Court of Appeal stated, "Having examined the trial judge's statements and conduct as a whole, we are drawn ineluctably to the conclusion that his 'conduct indicated an "unsympathetic attitude toward the litigation" that did "not accord with recognized principles of judicial decorum consistent with the presentation of a case in an atmosphere of fairness and impartiality[]" . . . .' [Citations.] The court's remarks throughout trial show that its conception of the circumstances that may constitute sexual harassment were based on stereotyped thinking about the nature and roles of women and myths and misconceptions about the economic and social realities of women's lives. The average person on the street might therefore justifiably doubt whether the trial in this case was impartial. [Citation.]" (*Id.* at p. 262.)

While in *Hall, Iverson* and *Catchpole* the court sat as the trier of fact, that alone is an insufficient ground for distinguishing these cases. We scrupulously guard against bias and prejudice, actual or reasonably perceived, not only to prevent improper factors from influencing the fact finder's deliberations, but to vindicate the reputation of the court itself. As the *Catchpole* court sagely observed, "We must also keep in mind . . . that the source of judicial authority lies ultimately in the faith of the people that a fair hearing may be had. Judicial behavior inimical to that necessary perception can never be countenanced and may well provide a basis for reversal . . . ." (*Catchpole v. Brannon, supra,* 36 Cal.App.4th at p. 253.)

We need not repeat the record establishing an appearance of unfairness and bias. In its lengthy discourse, the court recited a veritable litany condemning and impugning the character of undocumented immigrants, including plaintiff, who place a burden upon the taxpayers by obtaining educational, medical, housing, and other services ("yada, yada," i.e., the list goes on) to which they are not entitled, and then add insult to injury by suing the providers, such as "the good doctor [defendant]" in order to make "a pot of

[undeserved] money."[6] We have no difficulty concluding "the average person could well entertain doubt whether the trial judge was impartial." (*Catchpole v. Brannon, supra,* 36 Cal.App.4th at p. 247.) That being the case, we "are not required to speculate whether the bias was actual or merely apparent, or whether the result would have been the same if the evidence had been impartially considered and the matter dispassionately decided [citations], but [will] reverse the judgment and remand the matter to a different judge for a new trial on all issues." (Code Civ. Proc., § 187; *Catchpole v. Brannon, supra,* 36 Cal.App.4th at p. 247.)

*Motions in Limine re Psychological Condition*

■ Plaintiff also filed two motions in limine, one to exclude evidence of his psychological condition in general, the other to exclude any reference to suicidal ideation and domestic abuse. The court granted the latter motion. Subsequently, plaintiff withdrew any request for emotional distress damages and offered to strike words regarding psychological and emotional distress from the jury instructions.

During trial, in cross-examining plaintiff's expert, defense counsel asked: "You are aware [plaintiff] underwent two psychiatric evaluations?" The witness responded, "That's correct." Counsel then asked, "And you read he also had a 5150 hold on him with the County Mental Health Facility?"[7] The court sustained the objection of plaintiff's counsel. The subject was not raised again. There was no evidence elicited or offered relating to domestic abuse or suicidal ideation.

We find no ground for reversal here. Plaintiff's assertion he suffered prejudice by virtue of counsel's unauthorized conduct is purely speculative. Although the question alluding to a psychiatric hold under Welfare and Institutions Code section 5150 clearly constituted misconduct, the court promptly sustained plaintiff's objection.

*Motion in Limine, Motion for Disqualification and Mistrial re Attorney Conduct*

■ Finally, plaintiff moved to exclude evidence relating to medical malpractice claims against his expert witness, Aengst. Inter alia, plaintiff asserted he had recently learned Aengst was currently being represented in

---

[6]The court's comments brought plaintiff himself squarely within range of the stereotype: "I noticed he dropped some of the claims so he might have been fudging on those—faking it as it were . . . ."

[7]Welfare and Institutions Code section 5150 authorizes an involuntary hold on a mentally disordered person who "is a danger to others, or to himself or herself."

other matters by Tuverson & Hillyard, the same law firm that was representing defendant. Plaintiff argued any evidence elicited would be irrelevant and unduly prejudicial in that it would require a "mini-trial" regarding Aengst's competency. Additionally, any inquiry as to Aengst's malpractice history would require defense counsel to betray her professional relationship with Aengst and place her "in an ethically compromising position where [she] would cross-examine Dr. Aengst about a case in which Dr. Aengst has divulged confidential information to [counsel]."

The court initially granted the motion, but later reversed itself, with the proviso that counsel could not inquire into any matters in which her law firm represented Aengst. Thereafter, defense counsel rigorously cross-examined Aengst about his history of malpractice claims. To place the issue in proper perspective, we summarize the relevant cross-examination at some length, although not in its entirety.

The initial inquiry focused on Aengst's litigation history in general: "Q. And, doctor, while we're on the topic of truth, you've been sued in medical malpractice actions before haven't you? [¶] A. Yes, I have. [¶] Q. On many, many occasions? [¶] A. We've had several, yes. [¶] Q. You've had several. You've had. And this is just a cursory review. You've had 11 that I see in Orange County . . . doing a Santa Ana search; is that about right? [¶] A. I can't remember. [¶] Q. And about 10 in L.A. County, do you remember that? [¶] A. It's possible. I can't say for sure. [¶] Q. Can't say for sure. And you've got about—and I found four locally in muni court, does that ring a bell? [¶] A. I don't think those were malpractice cases. [¶] Q. Now, doctor, you've had, even if we take away those, you have 21 cases just in L.A. County and in Orange County, right? [¶] A. I don't know. I can't say. [¶] Q. Can't say. And some of them actually are in 1999. I mean, they're not that old, right? [¶] A. We've had—yes, we've had one or two in 1999, yes. [¶] Q. When you say we, you're talking about you, right? [¶] A. Yes." Counsel then read into the record Aengst's deposition testimony in which he stated he had been sued " 'about two or three times,' " with the last claim being " 'several years ago.' "

Subsequently, there was the following exchange involving Aengst's license status: "Q. Now, doctor, you've also, staying on that topic of being honest and telling the truth, you've also had your license suspended and you were on probation several years ago for gross negligence, were you not? [¶] A. Yes. [¶] Q. And in fact you have a current accusation filed by the Attorney General's office that's pending right now, correct? [¶] A. Yes. [¶] Q. And that's for gross negligence, incompetence, repeated negligent acts and unprofessional conduct, right? [¶] A. I'm not sure what the charges are."

Counsel then read from the doctor's deposition testimony wherein he denied he had ever had his license suspended, revoked or investigated in any way.

At this point in the proceedings, plaintiff's counsel sought a conference outside the presence of the jury, and moved the court to disqualify counsel and her law firm from representing defendant and grant a mistrial. After hearing lengthy argument, the court denied the motion, stating the information used by counsel to weaken Aengst's credibility "was public record and nothing that could have been gleaned from any conference with a lawyer." Defense counsel resumed, reading into the record, over plaintiff's counsel's objection, the *accusations* of the attorney general's complaint in a disciplinary proceeding. It is undisputed Tuverson & Hillyard were, at the time, representing Aengst in the disciplinary proceeding and had represented him in the medical malpractice case out of which it arose.

Finally, at the conclusion of trial, defense counsel devoted a substantial part of her closing argument to berating Aengst as "a liar" who had been false in his deposition testimony and "had the guts to come in here and lie to you [the jury]." Inter alia, she argued, "And what bothers me is when someone can come in this courtroom and completely disregard what this is all about, what this system is all about, with our flag, with the seal of the state, the judge sitting on the bench, and can raise their right hand and take that oath to tell the truth, and they look at you and they don't tell the truth, they lie to you. [¶] . . . [¶] And I'm actually quite grateful to Dr. Aengst for finally admitting that he had lied so that I don't have to feel so uncomfortable standing up here calling him a liar because he finally admitted that he lied several times." Counsel also reminded the jury of a prior suspension of Aengst's license, his "botched surgeries that resulted in a deformity to [a patient's] nose," and the "Attorney General's" investigation and complaint alleging "act[s] involving dishonesty or corruption." Indeed, the bulk of counsel's argument was devoted to destroying her own client's professional reputation.

Our analysis of the issue focuses on the attorney's duty of *loyalty* to Aengst. Rule 3-310(C)(3) of the State Bar Rules of Professional Conduct provides that an attorney "shall not . . . [¶] . . . [¶] [r]epresent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter." In *Flatt v. Superior Court* (1994) 9 Cal.4th 275, 286 [36 Cal.Rptr.2d 537, 885 P.2d 950], the court observed, " 'When a client engages the services of a lawyer in a given piece of business he is entitled to feel that, until that business is finally disposed of in some manner, he has the undivided loyalty of the one upon whom he looks as his advocate and his

champion.' " The feeling of loyalty is " 'necessarily destroyed' " if the lawyer accepts representation hostile to his client's interests. (*Ibid.*) Because " '[a] lay client is likely to doubt the loyalty of a lawyer who undertakes to oppose him in an unrelated matter[,] the decisions condemn acceptance of employment adverse to a client even though the employment is unrelated to the existing representation.' [Citation.]" (*Id.* at p. 287.)

Defense counsel's firm was simultaneously representing defendant *and* Aengst. Defense counsel's representation of Paicius required her to create a record impeaching her other client's professional reputation and credibility. In pursuing her ends in this case, counsel demonstrated a dulled sensitivity to professional ethics and engaged in an egregious and shocking breach of her duty of loyalty to Aengst.[8]

The court should have intervened. It did not. Despite having granted plaintiff's motion in limine to exclude evidence of the cases against Aengst, and notwithstanding plaintiff's counsel's repeated evidentiary objections and protests regarding the obvious breach of professional ethics, the court allowed counsel to proceed without restriction and denied plaintiff's motion for counsel's disqualification and a mistrial. Disregarding her professional duty, inter alia, to vigorously represent Aengst in any claims made against him, defendant's attorney, given free rein, grilled Aengst, asking him long, narrative "questions" consisting of little more than counsel's reading into the record, over plaintiff's vigorous objections, line after line of *allegations* of professional malfeasance contained in the complaints.

The court was not inclined to put a stop to these narratives. At one point, defense counsel was reading the medical board's official accusations against Aengst into the record. Plaintiff's counsel interrupted with an objection to the "question" as compound, argumentative, and an improper use of a document not admitted as evidence. Instead of sustaining the proper objection to this extraordinarily improper question, the court urged counsel on, stating, "Counsel, you object at the end of a question[,] not in the middle of it. Finish it up, ma'am." Moreover, when counsel completed her "mini-trial" of Aengst, the court, without allowing argument on the issue, *admitted* into evidence not only a copy of the civil index with highlighted listings of 21 suits against Aengst containing no indication as to the nature of those actions, but the Attorney General's *complaint* containing unsubstantiated

---

[8]We are not impressed with defense counsel's protests at trial that she was initially unaware of the dual representation, that her association with Tuverson & Hillyard's Orange County branch was relatively recent, that the firm's Los Angeles branch represented Aengst, and that there was no internal mechanism by which she could have discovered the problem. Perhaps the firm has by now corrected a system that apparently provided no safeguards against the type of ethical problems that appear here.

hearsay allegations and conclusions, together with legal definitions of the charges brought against the doctor. In declining to allow plaintiff's counsel to be heard on his objections, the court stated: "I'm not going to keep the jury waiting while we deliberate over 14 more exhibit items. All those items will be received into evidence and will go into [*sic*] the jury. They'll get everything, practically. If they want to look at it, they can sort it out. [¶] I don't think there's anything in there that's going to turn the tide on this case. They've heard it, and it's a very simple issue and it's been beaten to death." The improper exhibits were thus included in the packet presented to the jury for deliberations.

■ The spectacle of an attorney skewering her own client on the witness stand in the interest of defending another client demeans the integrity of the legal profession and undermines confidence in the attorney-client relationship. As our Supreme Court has stated, the reason for the rule barring dual representation is evident: "A client who learns that his or her lawyer is also representing a litigation adversary, even with respect to a matter *wholly unrelated* to the one for which counsel was retained, cannot long be expected to sustain the level of confidence and trust in counsel that is one of the foundations of the professional relationship."[9] (*Flatt v. Superior Court, supra,* 9 Cal.4th 275, 285.)

■ The court committed reversible error in denying plaintiff's motion to declare a mistrial. Our disposition of this issue should not be construed as suggesting that disqualification of counsel is the appropriate remedy in all cases in which one party's attorney represents an expert designated by the other side. A party's right to select counsel of his or her own choosing may trump the opposing party's freedom to choose an expert whose designation creates a conflict. And while we know Aengst was a percipient treating physician as well as a designated expert, the facts developed at trial as to how and when the problem surfaced are not sufficiently clear to allow us to formulate a rule of general application. We can say without hesitation,

---

[9]Defendant argues there is no evidence showing the information was gained within the confidentiality of the relationship, asserting the court found the materials were all contained in public records. But as noted, our analysis focuses on the duty of loyalty, not confidentiality. (*Flatt v. Superior Court, supra,* 9 Cal.4th at pp. 283-284 [explaining the separate interests at stake when applying conflict of interest rules—loyalty and confidentiality].) Further, even if confidentiality were the principal basis of our analysis, the only statement in the record supporting the assertion that no confidential information was used is counsel's unsworn representation, which does not constitute substantial evidence. In any event, plaintiff has no way effectively to disprove counsel's self-serving assertion, and we are not required to assign that burden to him. "Where the requisite substantial relationship between the subjects of the prior and the current representations can be demonstrated, access to confidential information by the attorney in the course of the first representation (relevant, by definition, to the second representation) is presumed . . . ." (*Flatt v. Superior Court, supra,* 9 Cal.4th at p. 283.)

however, that if the conflict has not been resolved by the time the client/ witness is called to the stand, the court is faced with an insuperable obstacle to going forward—an attorney with two clients in circumstances where he or she can be loyal only to one. The court cannot permit, much less preside over, an attorney's attack on his or her own client. Rather, in the interests of the integrity of the bench and bar, it must declare a mistrial.[10]

## DISPOSITION

The judgment is reversed. The case is remanded for retrial. The Presiding Judge of the Orange County Superior Court is directed to reassign the matter to a different judge. Defendant's counsel, Constance A. Endelicato, and the clerk of this court are *each* ordered to forward a copy of this opinion to the State Bar upon return of the remittitur. (Bus. & Prof. Code, §§ 6086.7, subd. (b), 6068, subd. (o)(7).) Appellant shall recover his costs on appeal.

Rylaarsdam, Acting P. J., and Moore, J., concurred.

A petition for a rehearing was denied June 25, 2003, and respondent's petition for review by the Supreme Court was denied August 27, 2003. Werdegar, J., did not participate therein.

---

[10]While we find it unnecessary to decide whether plaintiff suffered actual prejudice from counsel's misconduct, we note in passing that Aengst, confronted in court by a cross-examiner who was privy to his confidences, may well have been intimidated to the detriment of plaintiff's case.