Filed 8/13/14  In re Alexis C. CA1/5
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re ALEXIS C., a Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN & FAMILY SERVICES BUREAU, Plaintiff and Respondent, v. JASON C. et al., Defendants and Appellants. | A140043 (Contra Costa County Super. Ct. No. J12-00130) |

Jason C. (Father) and Carissa L. (Mother) appeal an order terminating their parental rights with respect to Alexis C.[1]  Mother contends her due process rights were violated by the juvenile court's bias, the adoptability finding was not supported by substantial evidence, and the juvenile court erred in failing to apply the beneficial relationship exception to parental termination.  Father contends notice pursuant to the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.; ICWA) was inadequate.  We remand for the limited purpose of ensuring compliance with ICWA, and otherwise affirm.

**BACKGROUND**

In January 2012, Alexis (born February 2010) was detained by the juvenile court.  In March, Mother pled no contest to allegations that (1) she placed Alexis at risk because

---

[1] Father is Alexis's natural father only.  The juvenile court also terminated the parental rights of Alexis's presumed father; he is not a party to this appeal.

1

of her domestic violence relationship with Father, and (2) she failed to provide adequate nutrition and medical care for Alexis, causing Alexis to be significantly underweight and resulting in a diagnosis of failure to thrive. At the jurisdiction hearing, the Contra Costa County Children and Family Services Bureau (Bureau) also noted receiving "multiple reports" that Mother was abusing pain medications she was prescribed for chronic pain. A subsequent report noted concerns raised by Father, the paternal grandmother of an older child of Mother's, and Mother's cousin, about Mother's prescription drug abuse and resulting inability to adequately care for her children. Mother denied abusing prescription drugs. The juvenile court dismissed a substance abuse allegation in the petition and Mother agreed to submit to drug testing. At the May 2012 disposition hearing, the court adjudged Alexis a dependent of the juvenile court and ordered reunification services for Mother, including four supervised one-hour visits per month.

The review hearing was continued several times and finally held over four days in April and May 2013. Among the substantial amount of evidence presented at this hearing was the following. Mother testified she was not a drug addict and had never abused prescription drugs. However, she had 12 positive drug tests between April and November 2012, some of which indicated substances for which Mother had no prescription. Mother testified she did not know why Alexis failed to thrive before she was detained, but Father testified Alexis physically suffered as a result of Mother's abuse of prescription medication.[2] The Bureau continued to receive reports that Mother was abusing prescription medication. Mother and Father gave contradictory accounts of the alleged domestic violence in their past relationship; Mother had previously recanted and then reasserted her allegation of domestic violence several times to Bureau staff. Mother had regular visits with Alexis at which she was affectionate and engaged. At the conclusion of the review hearing, the Bureau recommended reunification services be continued because, while it had some concerns, Mother had been cooperative and made

---

[2] Alexis began gaining weight after being removed from Mother's custody and, as of the April and May 2013 hearing, was in good health and no longer being treated for low weight.

significant progress. Alexis's counsel argued strongly against this recommendation, characterizing Mother as "a liar, a manipulator," and asking that services be terminated. The juvenile court agreed with Alexis's counsel, terminated services, and set a Welfare and Institutions Code section 366.26[3] hearing date. Mother did not petition for extraordinary writ relief.

At the section 366.26 hearing, the Bureau recommended parental rights be terminated. The Bureau's section 366.26 hearing report stated Alexis was generally adoptable because she was "a healthy, developmentally appropriate three year old with no behavioral issues." The Bureau reported Alexis's regular visits with Mother were positive and affectionate and Alexis and Mother had "a significant relationship." Although Alexis initially cried at the end of the visits, after April 2012 it was easier for her and Alexis appeared happy to be returned to her foster family when the visits were over. Mother testified Alexis was excited to see her and told Mother she wanted to go home with her. The juvenile court terminated Mother's and Father's parental rights.

## DISCUSSION

I. *Due Process*

Mother contends the juvenile court exhibited bias against her, thereby violating her due process right to an impartial forum. We disagree.

"The operation of the due process clause in the realm of judicial impartiality . . . is primarily to protect the individual's right to a fair trial." (*People v. Freeman* (2010) 47 Cal.4th 993, 1000 (*Freeman*).) "The role of a reviewing court 'is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the challenging party] a fair, as opposed to a perfect, trial.' " (*People v. Harris* (2005) 37 Cal.4th 310, 347.) The United State Supreme Court has "made it abundantly clear that the due process clause should not be routinely invoked as a ground for judicial disqualification. Rather, it is the exceptional

_____

[3] All undesignated section references are to the Welfare and Institutions Code.

case presenting extreme facts where a due process violation will be found. [Citation.] Less extreme cases—including those that involve the mere appearance, but not the probability, of bias—should be resolved under more expansive disqualification statutes and codes of judicial conduct." (*Freeman,* at p. 1005.)[4]

As evidence of the alleged bias, Mother refers solely to the juvenile court's comments and orders issued at the April and May 2013 hearing at which the section 366.26 hearing was set. " '[*A*]*ll* orders issued at a hearing in which a [section 366.26 hearing] setting order is entered' " are not appealable unless a timely writ petition is filed. (*In re Tabitha W.* (2006) 143 Cal.App.4th 811, 815–816.) As Mother did not file such a petition, she may not appeal these orders and we will not review whether they were made in error. The parties also dispute whether Mother forfeited any challenge based on these orders by failing to object to them below. Mother contends she relies on the events taking place at the April and May 2013 hearing solely as evidence of the juvenile court's bias. We assume without deciding that the events and orders taking place at this hearing can be so used absent a timely writ petition or objection below.

Mother contends the juvenile court acted as an advocate, citing cases in which triers of fact conducted substantial witness examination and/or objected to questions of counsel. (E.g., *In re Jesse G.* (2005) 128 Cal.App.4th 724, 729–30.) However, all of the conduct identified by Mother as evidence of bias took place at the *conclusion* of the lengthy hearing, after the juvenile court heard evidence and argument from all parties. Mother does not contend the juvenile court improperly questioned witnesses, objected to questions of counsel, or engaged in any other inappropriate conduct during the

---

[4] Mother's citations to cases for the proposition that the appearance of bias alone can constitute a due process violation fail to acknowledge these cases were expressly disapproved by *Freeman* to the extent they so held. (*Freeman, supra,* 47 Cal.4th at p. 1006, fn. 4 [disapproving, to the extent they contain language inconsistent with *Freeman*'s analysis, *Hernandez v. Paicius* (2003) 109 Cal.App.4th 452; *Hall v. Harker* (1999) 69 Cal.App.4th 836; *Catchpole v. Brannon* (1995) 36 Cal.App.4th 237; *In re Marriage of Iverson* (1992) 11 Cal.App.4th 1495].)

presentation of evidence or argument. Accordingly, there is no support for the contention the juvenile court improperly acted as an advocate.

Moreover, the juvenile court's conduct at the conclusion of the hearing does not show bias. Mother highlights comments the court made about her and Father in the course of stating the court's adverse credibility finding against Mother.[5] Mother also points to the juvenile court's comments criticizing the Bureau for believing Mother and recommending additional services.[6] Mother contends the juvenile court ordered the Bureau to remove the social worker and supervising social worker from the case. However, the court only directed that these individuals not supervise subsequent visitations.[7] Finally, Mother points to the juvenile court's order limiting visitation to once per month and prohibiting Mother from calling Alexis on the telephone.

All of the identified conduct is either an articulation or result of the juvenile court's adverse credibility finding against Mother—a finding which lies in the sole

---

[5] "I think this mother has lied repeatedly. I find her completely not credible. I find every single thing that [counsel for Alexis] said to be true. [¶] I do not find the mother credible. I think she is manipulative beyond belief. [¶] I feel so sorry for [Father]. [¶] I found you credible. I think you took some real risks. I think you have been led a merry dance by this woman. I don't know how you're still standing up here, were able to come up and talk about it. I really felt very sorry for you."

[6] "I'm amazed with the [Bureau]—your judgment. I'm astounded. I'm really embarrassed for you. I find your judgment in this case to be so wrong"; "What on earth are you thinking? I think the [Bureau] should go back and look at themselves and read through those reports again, as I have done. The red flags are everywhere. [¶] And you have allowed that relationship [between Mother and Alexis] to develop to such a degree when this relationship should have been stopped a long time ago. I don't know whether you are just naive or your head was in the sand or you didn't do your job, but I do not find a substantial probability the child could be maintained safely in the home in giving the mother two more months."

[7] "I do not want Ms. Boucher [the Bureau social worker who wrote the status review hearing report] to be the supervisor of the visit at the [Bureau] since I found her judgment so poor. [¶] And, Ms. Wyrick [the supervising social worker], I also do not want you to be the supervisor of the visit at the [Bureau]. I want there to be a different person that does the supervising of the visit." We express no opinion on the propriety of a juvenile court order directing Bureau staffing decisions; we review the order solely to determine whether it evidences judicial bias.

discretion of the juvenile court. (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199–200.) None of the conduct suggests prejudgment of the facts by the juvenile court or preexisting bias. Instead, after hearing evidence and argument presented by all parties in a multi-day hearing, the juvenile court performed its role as trier of fact and found Mother not credible.[8] The court's language may have been strong, but our analysis does not hinge on that. (*People v. Harris, supra,* 37 Cal.4th at p. 347.) In sum, this is not one of "the exceptional case[s] presenting extreme facts where a due process violation will be found." (*Freeman, supra,* 47 Cal.4th at p. 1005.)

II. *Adoptability*

Mother contends the juvenile court's finding of adoptability is not supported by substantial evidence. Her sole argument is the Bureau did not present sufficient evidence of parents who were likely to adopt Alexis.

The uncontested evidence at the hearing was that Alexis was "a healthy, developmentally appropriate three year old with no behavioral issues." In its written report, the Bureau stated several families with completed home studies were interested in adopting a child such as Alexis, but no prospective adoptive parents had been identified at that time. At the hearing, the Bureau represented that a family was interested in adopting Alexis and visitations with the family had gone well. No other information about this family was presented.

" 'The sole issue at the selection and implementation hearing is whether there is clear and convincing evidence that the child is adoptable. [Citations.] In resolving this issue, the court focuses on *the child*—whether his age, physical condition and emotional state make it difficult to find a person willing to adopt him. [Citation.]' [Citation.] [¶] Although one of the factors in determining adoptability is the existence of prospective

---

[8] This case is unlike *Katheryn S. v. Superior Court* (2000) 82 Cal.App.4th 958, 973, cited by Mother, in which the reviewing court found the trial court's factual statements "unfounded." The juvenile court's comments about Mother were amply supported by substantial evidence. Moreover, *Katheryn S.* did not find the juvenile court biased or order the case assigned to a new judge on remand for further proceedings.

adoptive parents, 'it is not necessary that the minor already be in a potential adoptive home or that there be a proposed adoptive parent "waiting in the wings." [Citations.]' [Citation.] '[A] prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family*.' [Citation.]" (*In re Josue G.* (2003) 106 Cal.App.4th 725, 733.) The evidence that Alexis was a healthy three-year-old with no behavioral issues and that one family was interested in adopting her amply supports the finding that she was adoptable. (See *id.* at pp. 733–734.)

III. *Beneficial Relationship Exception*

Mother's final argument is the juvenile court erred in failing to conclude the beneficial relationship exception applies to prevent termination of her parental rights.

At a section 366.26 hearing, if the juvenile court finds the child adoptable, the court "shall terminate parental rights and order the child placed for adoption" unless it finds "the child would benefit from continuing the relationship" with the parent. (§ 366.26, subd. (c)(1)(B)(i).) To establish the beneficial relationship exception, a parent must demonstrate "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) The exception does not require "proof that the child has a 'primary attachment' to a parent or that the noncustodial parent has maintained day-to-day contact with the child." (*In re S.B.* (2008) 164 Cal.App.4th 289, 300.) However, "the parent must show more than 'frequent and loving contact' [citation], and be more to the child than a mere

7

'friendly visitor or friendly nonparent relative.' " (*In re Helen W.* (2007) 150 Cal.App.4th 71, 81.)[9]

At the time of the hearing, Alexis had spent nearly half of her young life out of Mother's custody. Although the Bureau's report stated Mother's visits with Alexis were affectionate and there was "a significant relationship" between them, there was no evidence the relationship was so beneficial to Alexis as to outweigh the permanency and stability she would gain in an adoptive home. (See *In re Angel B.* (2002) 97 Cal.App.4th 454, 466 ["A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree, but that does not meet the child's need for a parent."].) The juvenile court's conclusion the beneficial relationship exception did not apply is supported by substantial evidence and is not an abuse of discretion.[10]

IV. *ICWA Notice*

Father contends the ICWA notice failed to contain information about Alexis's great-grandparents and the Bureau submitted no evidence that it was unable to obtain this information from grandparents with whom the Bureau had contact. The Bureau concedes the error. We agree and remand for the limited purpose of ensuring compliance with ICWA.

ICWA requires notification be provided to an Indian tribe "when there is reason to believe the child may be an Indian child." (*In re Francisco W.* (2006) 139 Cal.App.4th 695, 703.) "Notice to the tribe must include available information about the maternal and paternal grandparents and great-grandparents, including maiden, married and former

---

[9] There is a split of authority regarding whether an appellate court reviews a challenge involving the beneficial relationship exception for substantial evidence, abuse of discretion, or a combination of the two. (See *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622.) We need not weigh in on this debate as our conclusion is the same under any of these standards.

[10] Mother argues the juvenile court's May 2013 order reducing her visitation schedule prejudiced her ability to successfully assert the beneficial relationship exception. We disagree, as we would affirm the court's rejection of this exception even if we considered only the relationship prior to May 2013.

8

names or aliases; birthdates; place of birth and death; current and former addresses; tribal enrollment numbers; and other identifying data." (*Ibid.*)

The Bureau made contact with Alexis's paternal and maternal grandfathers in connection with possible placement. However, the ICWA notices do not include the names or other identifying information about any of these grandfathers' parents, nor is there any indication in the record that such information was requested but not known. Accordingly, the notice may have been insufficient. (*In re Francisco W., supra,* 139 Cal.App.4th at pp. 703–704 [notices that failed to include sufficient information which could have easily been obtained were inadequate].) We will remand for the limited purpose of ensuring compliance with ICWA's notice provisions. (*See id.* at p. 711.)

## DISPOSITION

The judgment terminating parental rights is reversed and the case is remanded to the juvenile court with directions to order the Bureau, if it has not already done so, to interview Alexis's grandfathers regarding their Indian ancestry and identifying information about their parents. If the juvenile court finds these interviews resulted in additional identifying information regarding Alexis's ancestry in a federally recognized Indian tribe, additional notice shall be provided pursuant to ICWA. If, after any necessary additional notice is provided, a tribe claims Alexis is an Indian child, the juvenile court shall proceed in conformity with all provisions of ICWA. If, on the other hand, the juvenile court concludes no additional notice is required or no tribe claims

that Alexis is an Indian child, the judgment terminating parental rights shall be reinstated.

                                                           _____

                                                           SIMONS, J.

We concur.

_____

JONES, P.J.

_____

BRUINIERS, J.