Filed 5/1/13  Brown v. City of Los Angeles CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| DERRICK BROWN,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CITY OF LOS ANGELES et al.<br><br>    Defendants and Respondents. | B234308<br><br>(Los Angeles County<br>Super. Ct. No. LC083597) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Frank J. Johnson, Judge.  Affirmed.

Kim H. Pearman, A Law Corporation, Kim H. Pearman, Garo Hagopian, Robert L. Pearman, Miguel Muro, for Plaintiff and Appellant.

Carmen A. Trutanich, Los Angeles City Attorney, Amy Jo Field, Deputy City Attorney, and Craig J. Miller, Deputy City Attorney, for Defendants and Respondents.

## INTRODUCTION

A jury rejected plaintiff and appellant Derrick Brown's claim that defendant and respondent Los Angeles Police Department Officer Jerome Knopp committed a battery by a police officer against Brown by using unreasonable force to arrest him, to prevent his escape, or to overcome his resistance.[1]  The trial court entered judgment for Officers Knopp and Lambarth and defendant and respondent the City of Los Angeles.  Brown appeals and we affirm.

## BACKGROUND

About 4:30 a.m. on September 22, 2007, Officer Knopp and his partner Officer Lambarth responded to a radio broadcast concerning a screaming woman and a possible domestic violence incident at the Days Inn on Ventura Boulevard.  The officers arrived at the Days Inn in less than 30 seconds and went to room 207 on the second floor.  The door was open, and the officers entered.  The room was messy—items were turned over, discarded on the floor, or out of place.

When Officer Knopp entered the room the first thing he noticed was blood everywhere.  There was blood on the walls and carpet and the bed sheets were soaked with blood.  Officer Knopp had never before seen such a "massive quantity of blood."

Brown's girlfriend Valentina Andreta was squatting in the corner of the room cowering.  She was covered in blood from head to toe and her clothes were ripped and disheveled.  One of the officers asked her if she was injured.  She responded that she was not hurt and that it was not her blood.  She said that Brown had not hurt her.  Officer Lambarth contacted Brown in the bathroom.

Brown crawled out of the bathroom.  He was naked, "did some rolling," and flailed about.  Brown was covered in blood.  Brown "was screaming" and did not tell the

---

[1]    At the close of the evidence, the trial court granted defendant Los Angeles Police Department Officer Michael Lambarth's motion for nonsuit/directed verdict and dismissed him from the case.  Officer Lambarth's dismissal is not an issue on appeal.

officers what had happened. According to Officer Knopp, it was obvious that Brown needed medical attention and he immediately called for an ambulance.

As they waited for the ambulance, Officer Knopp saw Brown remove the barrel of a hypodermic syringe from a gaping wound in his arm; the barrel was completely inserted into Brown's arm. Officer Knopp did not see the syringe's plunger or needle. Officer Knopp was concerned that the needle had broken off in Brown's arm. He was also concerned about Brown's behavior and believed that Brown was experiencing an overdose or a bad reaction to a narcotic or that he was mentally unstable. Officer Knopp determined that, at a minimum, the crimes of possession of drug paraphernalia and being under the influence of drugs had been committed. Based on his experience, Officer Knopp knew that drug users suffer from hepatitis C and HIV/AIDS. He was concerned for his partner's safety because Brown was near his partner.

Officer Knopp did not know what caused Brown's injury, and no officer in the room put his hands on Brown to try to stop the bleeding.[2] When Brown removed his hand from his arm, blood squirted out. Brown tried to stop the bleeding by grasping his arm and by wrapping a lamp cord around the upper part of his arm. The officers advised Brown to apply pressure to the wound. Officer Knopp kicked a bath towel over to Brown and told him to wrap it around his injury.

Officer Knopp testified that a taser is a device that the police sometimes use against aggressive, combative suspects. A taser can be used to administer pain by placing it directly against a suspect's skin, or to affect a suspect's central nervous system through the deployment of two nitrogen gas propelled probes or darts that strike the suspect. The probes are barbed and attached to wires that are contained in a cartridge that is attached to the end of the taser. When the probes enter the skin of an aggressive, combative suspect they cannot be pulled out; they lodge and stay. Officer Knopp received taser training at the police academy

---

[2] Other than Officers Knopp and Lambarth, Officer Oscar Cordoba and his partner Officer Solomon Huss and Officers Ruiz and Elkins were present

3

Officer Cordoba removed Andreta from the room. After Andreta left the room, Brown "flail[ed] about towards the front door." Brown lunged at Andreta and grabbed her ankle. It appeared to Officer Knopp that Brown was going to bite Andreta and not allow her to leave. Officer Lambarth placed his hand on Brown's shoulder to try to keep him in the room. Brown eventually made his way out of the room and onto the balcony, however, and crawled to the balcony's wrought iron protective railing.

Brown sat down next to the railing, extended his left arm through the railing, and applied pressure by clamping down. It appeared to Officer Knopp that Brown was trying to stop his arm from bleeding, and he encouraged Brown to continue to apply pressure to his wound. Officer Knopp could hear the ambulance's siren and advised Brown that help was on the way and that he should stay calm.

Brown removed his arm from the railing and inserted it in another part of the railing and clamped down. Brown screamed that he was dying. After Brown made a couple of attempts to stop the bleeding, he slowly attempted to stand up. Brown assumed a semi-squatting position and held the railing with both hands. Brown looked all around and then started to move to his right. Brown's behavior indicated to Officer Knopp that he was preparing to jump off the balcony and flee. Officer Knopp became "very concerned" and took out his taser. Officer Knopp believed that Brown was under the influence of drugs and thought that Brown might believe that he would land in the pool below if he jumped.

In order to prevent Brown from injuring himself seriously or killing himself, Officer Knopp fired his taser at Brown. The officer was about six to 12 feet from Brown at the time.[3] Although Officer Knopp had been trained to give a verbal warning, when feasible, before firing his taser, he did not warn Brown because there was not enough time. When Officer Knopp fired his taser, the taser's two probes went towards Brown, but did not hit him. Officer Knopp knew in an instant that the prongs had missed Brown because he heard the prongs hit the wrought iron railing, producing a loud metallic sound

---

[3] Officer Knopp later estimated the distance as six to eight feet.

4

like a BB hitting a metal object. Officer Knopp was too late in firing his taser and saw Brown going over the "edge." Brown went over the railing head first and fell to the ground 12 feet below. Officer Knopp deactivated his taser and removed and dropped the cartridge to the ground. He believed that at least one of the prongs hit the railing. He found one of the probes. It was "bent almost in a 180" as if it "hit a hard object and bent around in that shape."

Officer Knopp testified that shooting Brown with the taser would have prevented him from jumping over the railing because a successful taser shot incapacitates a person immediately. He believed that if the taser prongs had hit Brown, Brown would have crumpled over on the balcony. Officer Knopp testified that Brown was not being combative with him at the time he deployed his taser.

Officer Knopp deployed his taser to keep Brown from jumping rather than grabbing Brown because he believed that Brown was unsafe to approach. Brown was aggressive and combative. Officer Knopp believed that Brown was under the influence of narcotics. He did not believe that he could hold onto Brown because Brown was naked and slippery from the blood. Brown also potentially had a hypodermic needle in his arm and could have pulled Officer Knopp over the rail, bitten him, or rubbed blood in his eyes.

Officer Knopp learned after the incident that there was cocaine in the room. The trial court informed the jury that the evidence seized in this case was destroyed during a routine purge of evidence at the Los Angeles Police Department. Officer Knopp was shown a photograph apparently of Brown's arm after the incident. Officer Knopp testified that injuries on Brown did not look like the injuries that would be caused by taser probes.

Officer Lambarth testified that he formed the opinion that Brown was under the influence of a narcotic within the first minute of observing him. The officer believed that Brown had committed crimes that needed to be investigated. Brown's possession of the syringe violated Health and Safety Code section 11364, and Brown appeared to be under the influence of a stimulant such as cocaine or methamphetamine. Officer Lambarth also

5

was concerned, based on the original radio broadcast, that Brown might have been "crazy" and a danger to himself or others within the meaning of Health and Safety Code section 5150 and thus needed to be detained. Although there were a number of crimes to investigate, Officer Lambarth did his best to de-escalate the situation. His goal was to calm Brown so that Brown could receive medical treatment.

Officer Lambarth testified that he believed that Brown engaged in aggressive and combative behavior generally, although that behavior was not intentionally directed at either Officer Lambarth or Officer Knopp. Brown was kicking, thrashing, and screaming. Brown's actions made it "extremely difficult" for Officer Lambarth to perform his job. Officer Lambarth could not conduct an investigation or render assistance due to Brown's actions. Officer Lambarth viewed Brown's attempts to escape or to hurt himself as aggressive behavior.

Officer Lambarth testified that he attempted physically to restrain Brown so that he could not leave the hotel room, but was unable to hold him for more than 15 or 20 seconds. Officer Lambarth believed that Brown's actions in freeing himself from Officer Lambarth's restraint was an attempt to escape and was resistance to Officer Lambarth's efforts to control him. After Brown broke free from Officer Lambarth he took two or three steps and looked left and right. Officer Lambarth associated such conduct with someone who was about to run from him. According to Officer Lambarth, Brown jumped over the railing.

Officer Lambarth agreed with Officer Knopp's decision to use the taser. The taser was the best tool to use under the circumstances. Officer Lambarth heard the taser discharge and make a sound that was consistent with a miss. A miss makes a loud clicking noise; a hit makes a muted hum or buzz due to the completed circuit with the probes.

Officer Cordoba testified that Brown leaned over the railing causing him "to go over the railing." As Brown was leaning over the rail, Officer Cordoba heard a noise that he believed was a taser being fired followed by a noise that indicated that the taser had

missed its target. Officer Cordoba also saw the taser probes fly over Brown. He did not believe that Brown jumped from the balcony.

Officer Cordoba believed that the taser was the correct tool to use to deal with Brown under the circumstances. It was not a deadly force situation, but it was unsafe to approach Brown. If the taser had hit Brown, Brown would have fallen to the balcony where he would have stayed. Officer Cordoba did not believe that Brown was aggressive or combative towards him, but that he was aggressive towards Officers Knopp and Lambarth and aggressive and combative towards Andreta.

Officer Huss's deposition testimony was read to the jury. Officer Huss testified that Brown intentionally went over the railing. Officer Huss did not believe that the taser probes contacted Brown when Officer Knopp fired his taser because Brown did not appear to be affected by the taser, but he could not say with certainty that the probes had not contacted Brown.

Los Angeles Fire Department Firefighter/Paramedic George Ross responded to the Days Inn. As he entered the property, Ross saw Brown exit a hotel room and behave erratically. Brown moved back and forth and then propelled himself over the railing as if he were trying to flee. Brown landed on his head on the pool deck. Ross told a colleague that Brown had jumped. Ross went to Brown, who was unconscious, and rendered aid. When Brown regained consciousness, he was "extremely combative." It is not unusual for a person with a head injury to be combative. Ross and others restrained Brown and took him to the hospital. Ross did not know if Brown had been shot with a taser.

Dr. Ziva Nagar, a psychologist on call at Providence Holy Cross Medical Center, testified that she treated Brown, but did not remember him. According to her September 29, 2007, report, Brown said that "he was taking drugs, and jumped off a second-story building." The report later stated, "He was doing drugs, and then the police showed up, and he jumped off balcony. He reported that he did mostly amphetamine and cocaine and injected them." Brown tested positive for Benzodiazepine, cocaine, amphetamine, and barbiturates. Dr. Nagar asked Brown what happened. Brown said he jumped off the building, but denied that he was suicidal.

7

Sergeant Harry Markel was in charge of the tactics unit for the Los Angeles Police Department. He trained officers in the use of force and the use of tactics before using force. Sergeant Markel testified that under Penal Code section 835a an officer may use force to make an arrest, to overcome resistance, or to prevent escape. Sergeant Markel testified that officers are trained to avoid tasing persons who are at significant risk of falling. It is proper, however, to use a taser to save someone's life.

Sergeant Markel reviewed various materials in this case, including deposition transcripts, a report from the Investigation Division of the Los Angeles Police Department, various interviews, and 324 photographs. Sergeant Markel also interviewed "the officers." Based on his review and interviews, Sergeant Markel believed that the use of force—i.e., Officer Knopp's use of the taser—was objectively reasonable under California and federal law.

Sergeant Markel based his opinion on the domestic violence radio call that the officers received; the state of the Days Inn room when the officers entered; the presence of a woman (Andreta) crouched in the corner; and the presence of a wet, bleeding, naked man (Brown) who had pulled a hypodermic needle from his arm, was yelling, and was in medical need. The officers attempted to calm Brown. Brown made his way to the balcony and used the railing to try to stop the bleeding. Brown refused to follow the officers' commands. The officers were trying to get Brown under control. Brown grabbed the railing and the officers thought he was about to jump over the railing. In order to stop Brown from harming himself, Officer Knopp used his taser. According to Sergeant Markel, given the limited space on the balcony, incapacitation through use of the taser was the best force option.

Brown testified that he and Andreta were driving to Ventura to visit his aunt when it started to rain so heavily that he could not see. Brown decided to stop and stay at the Days Inn. Brown and Andreta had their dog with them. Brown and Andreta were given room number 207.

Brown said that at some point, he and Andreta went to a market to buy beer and cigarettes. After returning to their room, Andreta took a shower. While Andreta was in

8

the shower, Brown told her that he was going to take the dog for a walk. As Brown turned to leave, he tripped over the dog and fell hard. Brown had been holding an ashtray that broke in the fall. When he picked himself up, Brown felt something hot on his arm and determined that his left arm had been cut around the biceps. Brown attempted to stop the bleeding with his hand, but was unsuccessful. He went to the bathroom and told Andreta that he needed her help. Brown was bleeding heavily and was afraid. Brown told Andreta to call for help. When Officers Knopp and Lambarth arrived, Brown was in the bathroom in the tub washing the blood off himself.

According to Brown, the officers instructed him to come out of the bathroom. Brown did not wrap a towel around himself because he was holding the cut on his left arm with his right hand. When he came out of the bathroom, Brown waited for the officers to tell him what to do, but they did not say anything. Brown repeatedly asked for help.

Brown said he tried to stop the bleeding himself by using a lamp cord for a tourniquet, but his hand was too slippery. Brown also used a towel and a bed sheet to try to stop the bleeding. One of the officers told Brown that he should have Andreta help him. Brown lay on the floor, and Andreta applied pressure to his arm. The officers allowed Andreta to help Brown for two or three minutes and then took her out of the room. The officers told Brown a number of times to calm down and lie still. They said that the paramedics were on the way. Brown admitted that the police officers' conduct was very professional other than the failure to render assistance.

Brown stated, after Andreta was taken from the room, no one helped him try to stop the bleeding. At that point, Brown's hands no longer worked and he became terrified. Because no one was helping him, Brown followed Andreta. He was cold, his body was shaking, and he could not stand up, so he crawled.

According to Brown, at some point, he made it out to the balcony. He crawled to the rail, looking for a way to stop the bleeding. He pressed his arm to the railing to stop the bleeding, but could not get his arm through. He pulled himself up to an area of the railing that he could put his arm through and began applying pressure, but he slipped and

9

fell to the balcony. He tried to pull himself up again. He was not trying to jump over the railing or commit suicide.

Brown said that as he tried to pull himself up the second time, he heard a loud click or pop and saw darts hit his arm. Before he heard the loud click or pop, no one told him not to jump or warned him that he was going to be tasered. Brown felt incredible pain over his entire body. His eyes stopped working and all he could see was "like a streak." According to Brown, Officer Knopp shot him with a taser. He testified that he had no idea where the taser hit, he just knew where the marks were. The next thing Brown knew, he was in the hospital. He had been in a coma for a week or 10 days.

Brown said he spoke with a woman at the hospital about his psychological profile. Brown got into an argument with her because she tried to tell him that he jumped. Brown told her, "Lady, that's not what happened. . . . The police were there and I was shot." The lady became angry "right away," picked up her notebook, and walked out.

Brown testified that Andreta did not use drugs. To his knowledge, Andreta did not use needles. Brown did not have a condition that required him to have a hypodermic syringe, and he denied that he pulled a syringe from his arm. Brown admitted that he ingested a "line" of cocaine during the afternoon prior to sustaining his injuries. Brown did not know why cocaine or a syringe was found in his room. Brown testified that he had ingested cocaine or methamphetamine through an injection once or twice in his life and such ingestion occurred over 10 years prior. Brown admitted that he had been convicted of three felonies of moral turpitude.

Larry Smith, a former police officer, testified on Brown's behalf as a use of force expert. Smith testified that he believed that the officers tasered Brown, that the taser probes struck Brown, and that use of the taser was excessive force. Smith believed that the use of force was excessive because "this was a medical-aid call, Mr. Brown was crawling on the ground, pleading for help, and the officers gave none." Brown had not violated the law or refused to follow a command. The taser should not have been used under the circumstances. The officers could have grabbed and held Brown. According to Smith, police officers are trained not to shoot someone with a taser if the person is near

10

water or in a position to fall and be injured. Brown's position next to the railing was a dangerous position. Smith believed that the taser probes struck Brown based on the position of the taser cartridge, the two probes that were hanging over the railing, and the picture of Brown's arm. Smith believed that the picture of Brown's arm showed marks from taser probes.

Smith acknowledged that police officers have the legal right to overcome resistance, to prevent escape, and to make an arrest. According to Smith, if Brown continued to "thrash and flail and kick and crawl" even though an officer told him to calm down and that help was on the way, the officer would have the right to control the situation. According to Smith, possession of drug paraphernalia is a crime. A syringe is considered drug paraphernalia absent a medical excuse and possession of a syringe without a medical prescription or medical need is a crime. Being under the influence of a narcotic is a crime. Police officers are trained to recognize the objective signs and symptoms that persons who are under the influence of stimulants like cocaine display. Domestic violence is a crime. Smith testified that an officer has the right to control a situation to conduct an investigation.

Smith admitted that he stated in a January 12, 2011, declaration that he could not determine whether Brown was struck by the taser probes or whether he jumped over the railing fearing that he would be struck. Smith explained that at the time he made his declaration, he had reviewed all the information about incident, but was not yet thoroughly familiar with everything. Paragraph three of the declaration, however, stated that Smith was "thoroughly familiar with the file."

## DISCUSSION

**I.    Exclusion of a 2002 Los Angeles Police Department Training Bulletin on the Use of Tasers**

Brown contends that the trial court violated Evidence Code section 721, subdivision (b)(1)[4] in denying his motion in limine to admit in evidence a January 2002 Los Angeles Police Department Training Bulletin on the use of tasers (2002 Training Bulletin).  The trial court did not prejudicially err.

"Evidence Code section 721, subdivision (a), provides in pertinent part that 'a witness testifying as an expert may be cross-examined to the same extent as any other witness and, in addition, may be fully cross-examined as to . . . the matter upon which his or her opinion is based and the reasons for his or her opinion.'  Such cross-examination properly includes documents and records examined by an expert witness in preparing his or her testimony.  [Citation.]" (*People v. Smith* (2007) 40 Cal.4th 483, 509.)

Prior to trial, Brown filed a motion in limine asking the trial court to "allow the LOS ANGELESS CITY Taser Training Manual into evidence before the Jury as a circumstance to be considered by them as to their determination of objective, unreasonable force in this case.  [Citations.]"  In his deposition, Sergeant Markel testified

---

4    Evidence Code section 721states:

"(a)    Subject to subdivision (b), a witness testifying as an expert may be cross-examined to the same extent as any other witness and, in addition, may be fully cross-examined as to (1) his or her qualifications, (2) the subject to which his or her expert testimony relates, and (3) the matter upon which his or her opinion is based and the reasons for his or her opinion.

"(b)    If a witness testifying as an expert testifies in the form of an opinion, he or she may not be cross-examined in regard to the content or tenor of any scientific, technical, or professional text, treatise, journal, or similar publication unless any of the following occurs:

"(1)    The witness referred to, considered, or relied upon such publication in arriving at or forming his or her opinion.

"(2)    The publication has been admitted in evidence.

"(3)    The publication has been established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice.

"If admitted, relevant portions of the publication may be read into evidence but may not be received as exhibits."

12

that among the opinions he intended to offer at trial was the opinion that Officer Knopp's "use of the Taser was within the guidelines and policy of the Los Angeles Police Department." Sergeant Markel based that opinion on his "experience with use of force and the training bulletin dated January of 2002."

Even assuming that the trial court erred in denying Brown's motion in limine because Sergeant Markel relied on the 2002 Training Bulletin in forming his opinion that Officer Knopp's use of the taser fell within Los Angeles Police Department guidelines and policy (*People v. Smith, supra,* 40 Cal.4th at p. 509), any such error was not prejudicial because Officer Knopp and Sergeant Markel were examined about the substance of the Los Angeles Police Department's taser policy, if not specifically about the 2002 Training Bulletin itself.

Brown contends that his whole case was premised on the fact that Officer Knopp did not comply with the 2002 Training Bulletin when he tasered Brown. According to Brown, the 2002 Training Bulletin "repeatedly states that a taser should not be used unless the suspect is aggressive/combative. It also cautions against use when a suspect is in danger of falling . . . . It further requires a verbal warning when feasible, unless the Officer is attacked." Officer Knopp and Sergeant Markel testified about these matters. Officer Knopp testified that "[a] taser is a device that we can use against an aggressive combative suspect . . . ." He testified that use of the taser was the best option under the circumstances in this case because Brown's behavior was aggressive and combative. Sergeant Markel testified that officers are trained that they may use a taser against a suspect who is aggressive or combative. Sergeant Market testified that officers are trained to avoid using a taser when there is a significant risk that the suspect will fall. Officer Knopp testified that he had been trained to issue a verbal warning when feasible before shooting a suspect with a taser. Because the jury heard the substance of the 2002 Training Bulletin at issue, any error in not admitting the bulletin itself was harmless. In addition, there was evidence that Brown was aggressive and combative so that there was compliance with the provisions of the bulletin.

13

Moreover, to prove his battery by a police officer claim, Brown had to prove, among other things, that Officer Knopp "intentionally touched or caused [Brown] to be touched"—i.e., that the taser prongs struck Brown. (CACI No. 1305.) Based on the evidence adduced at trial, no reasonable juror would have found that the taser prongs struck Brown. The 2002 Training Bulletin only could have illuminated the issue of whether Officer Knopp should have fired his taser at Brown under Los Angeles Police Department policy and not the issue of whether the taser prongs hit Brown. In view of all of these considerations, any error in not admitting the bulletin was harmless.

## II.    Destruction of Evidence[5]

Brown argues that the trial court erred when it did not order "any type of remedy" for the City's deliberate destruction of evidence. The trial court did not abuse its discretion.

### A.    *Background*

Brown filed a claim for damages with the City on March 20, 2008. On February 2, 2009, as part of a purported routine evidence purge, the Los Angeles Police Department destroyed the evidence collected from Brown's room at the Days Inn. By letter dated December 9, 2010, in response to an inspection request, the City notified Brown that the evidence had been destroyed. On March 15, 2011, Brown filed a motion in limine to bar reference to that evidence because the Los Angeles Police Department had destroyed the evidence even though the City was on notice of Brown's claim.

At the hearing on Brown's motion in limine, Brown's attorney addressed two items of evidence: the syringe barrel and the taser prongs. Counsel argued that Brown was prejudiced by the destruction of the syringe barrel because counsel could not have

---

[5]    Later in his opening brief, Brown argues that the trial court's errors in barring his counsel from cross-examining Sergeant Markel on the 2002 Training Bulletin and in failing to impose sanctions on the City for destroying evidence denied him a fair hearing and the right to present important evidence. That later argument is a brief restatement of the argument addressed here and the argument addressed in Section I above.

the barrel tested to see it if contained any substances. Destruction of the taser prongs was prejudicial because the prongs could have been tested for blood or other material that might have proved that they struck Brown. The trial court denied the motion, ruling that Brown had not shown prejudice because the items had been photographed.

At a later hearing, Brown's attorney asked the trial court if Brown would be permitted to inform the jury that the evidence had been destroyed. Defendants' attorney opposed the request because the evidence had not been destroyed willfully. Without willful destruction, defendants' counsel argued, Brown was not entitled to a jury instruction. Further, defendants' attorney argued that it was a discovery matter and that 45 days had passed since Brown's attorney had received the response that the evidence had been destroyed. The trial court stated that Brown's attorney was not asking for a sanction, just that the jury be informed that the evidence had been destroyed. Brown's attorney stated that he could not prove that the destruction was willful, but noted that the evidence was destroyed after Brown filed his claim for damages with the City. The trial court took the matter under submission.

During trial, the trial court ruled that the destruction of evidence was a pretrial discovery issue that Brown had not timely raised. It revisited its ruling denying Brown's request for a sanction and stated that it was not during trial having a mini-trial about what had happened to the evidence. Thus, the trial court was not going to impose a sanction for the destruction of the evidence. The trial court, however, ruled that it would permit the jury to be informed that the evidence had been destroyed in a routine purging of evidence that occurred at the Los Angeles Police Department.

Brown's counsel argued that the purging policy at the Los Angeles Police Department did not appear to pertain to the destruction of the evidence in Brown's case. The trial court stated its view that the evidence should not have been destroyed, but restated that Brown could have addressed the issue in a pretrial discovery motion for sanctions. Brown's attorney stated that Brown had "brought a motion in limine just to be able to put that before the jury." The trial court again stated that it was not going to hold a separate trial on the issue. Brown's attorney responded, "the court has all kinds of

15

options of things it can do. We just want the jury to know it was destroyed." The trial court stated that the jury would be so informed. Brown's attorney, based on the trial court's ruling, suggested that the trial court inform the jury that the "evidence was destroyed as part of a routine purge, and it's . . . not here." As noted above, during Officer Knopp's testimony, the trial court informed the jury that the evidence seized in this case was destroyed during a routine purge of evidence at the Los Angeles Police Department.

### B.    Standard of Review

We review the denial of a motion in limine for an abuse of discretion. (*Hernandez v. Paicius* (2003) 109 Cal.App.4th 452, 456, disapproved on another ground in *People v. Freeman* (2010) 47 Cal.4th 993, 1006, fn. 4.) "A trial court exceeds the limits of legal discretion by making an arbitrary, capricious or patently absurd determination." (*In re Shirley K.* (2006) 140 Cal.App.4th 65, 71.)

### C.    Application of Relevant Principles

"Spoliation of evidence means the destruction or significant alteration of evidence or the failure to preserve evidence for another's use in pending or future litigation. [Citations.] Such conduct is condemned because it 'can destroy fairness and justice, for it increases the risk of an erroneous decision on the merits of the underlying cause of action. Destroying evidence can also increase the costs of litigation as parties attempt to reconstruct the destroyed evidence or to develop other evidence, which may be less accessible, less persuasive, or both.' [Citation.]" (*Williams v. Russ* (2008) 167 Cal.App.4th 1215, 1223.)

The trial court did not abuse its discretion in denying Brown's motion in limine based on its ruling that Brown's request for a sanction for the City's destruction of evidence should have been raised in a pretrial discovery motion rather than as a motion in limine at trial. (*Hernandez v. Paicius, supra,* 109 Cal.App.4th at p. 456; *In re Shirley K., supra,* 140 Cal.App.4th at p. 71.) The City informed Brown by letter dated December 9,

2010, that the evidence at issue had been destroyed. Brown delayed for three months before filing his motion in limine on March 15, 2011, which motion the trial court considered and denied on the eve of trial on April 11, 2011. Brown's delay prevented the trial court from holding an evidentiary hearing—other than a hearing during the middle of the trial—at which the trial court could determine the level of the City's culpability in the destruction of the evidence. Under the circumstances, the trial court did not abuse its discretion, i.e., it did not exceed "the limits of legal discretion by making an arbitrary, capricious or patently absurd determination." (*In re Shirley K., supra,* 140 Cal.App.4th at p. 71.)

### III.    Sufficiency of Evidence

Although not clear, Brown appears to argue that the jury's verdict is not supported by substantial evidence because the evidence demonstrated that he was neither aggressive nor combative towards Officer Knopp or Officer Lambarth. Although styled as addressing the sufficiency of the evidence, Brown's argument instead appears to be a repeat of his argument that the trial court erred in failing to admit the 2002 Training Bulletin. Nevertheless, there was substantial evidence supporting the jury's implicit finding that Brown was aggressive and combative.

"Under the substantial evidence standard of review, we review the entire record to determine whether there is substantial evidence supporting the jury's factual determinations [citation], viewing the evidence and resolving all evidentiary conflicts in favor of the prevailing party and indulging all reasonable inferences to uphold the judgment [citation]. The issue is not whether there is evidence in the record to support a different finding, but whether there is some evidence that, if believed, would support the findings of the trier of fact. [Citation.] Credibility is an issue of fact for the trier of fact to resolve [citation], and the testimony of a single witness, even a party, is sufficient to provide substantial evidence to support a factual finding [citation]." (*Fariba v. Dealer Services Corp.* (2009) 178 Cal.App.4th 156, 170-171.)

17

Officer Knopp testified that he used his taser rather than another type of force to prevent Brown from jumping over the railing in part because Brown was aggressive and combative. Officer Lambarth testified that Brown engaged in aggressive and combative behavior generally, although not directed at either Officer Lambarth or Officer Knopp specifically. Because credibility is a matter for the jury to decide, and the testimony of a single witness is sufficient to support a factual finding, the testimony of Officers Knopp and Lambarth that Brown was aggressive and combative is sufficient evidence. (*Fariba v. Dealer Services Corp., supra,* 178 Cal.App.4th at pp. 170-171.)

## IV. Removal of Juror

Brown contends that the trial court erred in failing to remove a juror who indicated she had reached a conclusion on the merits of the case prior to the end of the trial. Brown did not request that the juror be removed or otherwise object to the trial court's course of action, and so has forfeited review of this contention.

"'The right to unbiased and unprejudiced jurors is an inseparable and inalienable part of the right to a trial by jury. . . .' [Citation.]" (*Deward v. Clough* (1966) 245 Cal.App.2d 439, 444.) "'For a juror to prejudge the case is serious misconduct.' [Citation.]" (*Grobeson v. City of Los Angeles* (2010) 190 Cal.App.4th 778, 791, fn. 7.) To preserve a claim that a trial court erred in failing to excuse a juror for misconduct, however, an appellant must "seek the juror's excusal or otherwise object to the court's course of action." (*People v. Holloway* (2004) 33 Cal.4th 96, 124 [claim that a trial court's failure to excuse a juror for misconduct violated the appellant's right to an impartial jury was forfeited]; see also *People v. Stanley* (2006) 39 Cal.4th 913, 950 ["At the outset, we note defendant has conceded that his counsel failed to object to Juror C.'s continued service on the jury, and failed to request a mistrial on grounds of juror misconduct. As such, the claim is waived on appeal"].)

During trial, one of the jurors, "Miss Dorsey,"[6] expressed an opinion about the case to a courtroom assistant. The trial court spoke with the juror outside the presence of the other jurors. The trial court stated that it had been informed that the juror had reached a conclusion as to the merits of the case but advised the juror that she needed to keep an open mind while she heard the rest of the evidence. The trial court asked the juror if she could keep an open mind. The juror responded that she could. The trial court explained that conflicting evidence is presented in trials and that a person's view of the case often changes with the evidence. The trial court asked the juror to keep an open mind. The juror responded that she would. Brown's attorney remained silent throughout the exchange between the trial court and the juror. Brown's attorney did not request that the juror be removed, move for a mistrial, or raise the issue in Brown's new trial motion. Accordingly, Brown has forfeited review of this contention. (*People v. Holloway, supra,* 33 Cal.4th at p. 124; *People v. Stanley, supra,* 39 Cal.4th at p. 950.)

## V.     Evidence of Andreta's Prior Conviction

Brown claims that the trial court erred in failing to take judicial notice, pursuant to Evidence Code section 452, of a certified copy of Andreta's 1999 misdemeanor conviction for possession of a "hypodermic kit." The inference the jury could have drawn from such evidence, Brown argues, was that the syringe found in the hotel room belonged to Andreta and not to him. The trial court did not err.

"'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."

---

[6]     Citing pages 89 and 90 of the Reporter's Transcript, Brown describes Juror Dorsey as "the same juror who had indicated in voir dire that 'maybe' she would have a problem not giving a Police Officer's testimony additional weight or credibility just because they were an Officer." Brown misconstrues the record. Although Juror Dorsey (or "Dorcy") was at one time Prospective Juror No. 15 (see Reporter's Transcript at page 61), Brown has cited the response of another prospective juror, Jerilyn Grey, who was later seated as Prospective Juror No. 15 (see Reporter's Transcript at pages 84 and 89-90).

(Evid. Code, § 210.)  "[A] ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason."  (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19.)  We review a trial court's ruling on the admissibility of evidence for an abuse of discretion.  (*People v. Alvarez* (1996) 14 Cal.4th 155, 203.)

At the close of testimony, defendants objected to the admission of a certified copy of Andreta's 1999 misdemeanor conviction for possession of a "hypodermic kit" on the grounds that "it lacks foundation and is not probative or relevant."  The trial court ruled, "this misdemeanor conviction of the fact is of marginal relevance and completely inadmissible because it is hearsay.  [¶]  Now, and I remind all counsel that this trial is not about whether the plaintiff in this case did or did not possess a hypodermic kit or whether this witness who did not appear did or did not possess a hypodermic kit."  After further argument from Brown's attorney that the syringe cast Brown in a bad light and had been destroyed, the trial court stated, "This is an 11-year-old conviction that is of dubious relevance, and it's completely inadmissible for the purpose you're seeking to admit it.  So the objection is sustained."

Ownership of the syringe, and thus Andreta's prior conviction for possession of a hypodermic kit, was not relevant to any issue of consequence in the case.  When Officer Knopp arrived at Brown's hotel room, he was presented with a chaotic scene.  There was blood all over the hotel room.  Andreta was covered in blood and her clothes were torn.  Brown was naked, covered in blood, and screaming.  Brown removed the body of a syringe from his arm.  The presence of the syringe in Brown's arm may have contributed to Officer Knopp's determination that Brown was under the influence of a narcotic, which determination may have contributed to Officer Knopp's decision to fire his taser at Brown to keep Brown from jumping off the balcony.  Officer Knopp's decision to fire his taser at Brown, however, reasonably could not have depended on whether the syringe Brown removed from his arm belonged to Brown or Andreta.  It was the presence of the syringe in Brown's arm, and not ownership of the syringe, that was relevant.  Therefore, Andreta's prior conviction was irrelevant to any issue of consequence in the case.

20

It appears that the trial court excluded the prior conviction evidence on the grounds that it was irrelevant and hearsay. Because the evidence was not relevant, the trial court did not abuse its discretion in excluding it. (Evid. Code, § 210; *People v. Alvarez, supra,* 14 Cal.4th at p. 203; *In re Shirley K., supra,* 140 Cal.App.4th at p. 71.) Even assuming that the trial court excluded the evidence solely on the ground that it was hearsay and that hearsay was an improper ground for exclusion, we will not disturb the trial court's ruling on appeal because the evidence was, in any event, irrelevant. (*D'Amico v. Board of Medical Examiners, supra,* 11 Cal.3d at p. 19.)

## DISPOSITION

The judgment is affirmed. The City and Officer Knopp are awarded their costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


MOSK, J.


We concur:


ARMSTRONG, Acting P. J.


KRIEGLER, J.


21